Ferne B. KATZ, Plaintiff-Appellant,

v.

COMPREHENSIVE PLAN OF GROUP INSURANCE, ALLTEL Pension and Benefits Committee, et al., Defendants-Appellees.

No. 98-9251.

United States Court of Appeals,

Eleventh Circuit.

Dec. 8, 1999.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:96-CV-1675-TWT), Thomas W. Thrash, Jr., Judge.

Before CARNES, Circuit Judge, HILL, Senior Circuit Judge, and HOEVELER[*], Senior District Judge.

HILL, Senior Circuit Judge:

This is an appeal from the grant of defendants' motions for summary judgment.[1] It denies a widow's claim for an additional $202,000 in life insurance benefits alleged to be due under the group life insurance component of the employee benefits plan maintained by her husband's employer.[2] In many ways, it is a rather unfortunate appeal, as neither side attempts to take an unwarranted position. This is not a case of "the good guys win, the bad guys lose."[3] With this said, based upon the following, we affirm the orders of the district court.

---

[*]Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

[1]By this reference we mean to refer collectively to two different district court orders: (1) the first, dated December 16, 1997, granting defendants' motion for partial summary judgment and dismissing plaintiff's equitable claims under Count II (breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* (ERISA), more particularly § 1132(a)(3)); Count III (equitable estoppel); and Count IV (waiver); and (2) the second, dated August 26, 1998, granting defendants' motion for summary judgment as to Count I (recovery of benefits due under § 1132(a)(1)(B)).

[2]Mrs. Katz received $418,000 in life insurance benefits, plus interest. By filing this action, she is seeking a total of $620,000 in life insurance benefits, plus interest.

[3]In all candor, this case was tailor-made for mediation and settlement. And indeed, at the conclusion of oral argument, just such an avenue was suggested from the bench. It was unsuccessful.

I. FACTUAL BACKGROUND

Barry Katz died of AIDS in August 1995. At the time of his death, he had been a valued employee of TDS Health Care Systems Corporation (TDS) for more than twenty-five years. He rose to the level of Senior Vice President of Human Resources.[4] Mr. Katz was a plan participant in the ERISA qualified employees benefit program maintained by TDS (the TDS plan).[5]

In October of 1993, TDS was acquired by ALLTEL Corporation (ALLTEL). At the time of acquisition, ALLTEL maintained its own ERISA qualified employee benefits program (the ALLTEL plan).[6] Under the terms of the acquisition, TDS would continue to operate as an independent company and the TDS plan would remain in effect until December 31, 1994.[7] One of ALLTEL's goals during this thirteen or fourteen months was a smooth and "seamless transition" of employee benefits programs from TDS to ALLTEL, allowing TDS employees to become members of the ALLTEL plan without a lapse in coverage.

On January 1, 1995, upon the conclusion of the transition period, the ALLTEL plan would become effective for all former TDS employees in active service on that date.[8] Also on January 1, 1995, the TDS plan

---

[4]At his death, Mr. Katz' salary exceeded $150,000 per year. As the TDS human resources head, he maintained a special knowledge and expertise of benefits plans. His job responsibilities included oversight control over all benefits programs affecting TDS employees.

[5]The group life insurance component of the TDS plan was funded by Massachusetts Mutual Life Insurance Company (Mass Mutual). Under the Mass Mutual policy, TDS employees could select coverage in an amount equal to a factor of salary for both basic and supplemental life insurance.

[6]The group life insurance component of the ALLTEL plan was funded by Connecticut General Life Insurance Company (CIGNA). Under the CIGNA policy, benefits for both basic and supplemental life insurance could be, at most, two times the base salary of an ALLTEL employee. Although effective January 1, 1995, an agreement as to the terms of the policy was not reached until March 1995, and not formally signed and issued by CIGNA until May 3, 1995.

[7]Under the terms of the Mass Mutual policy in the TDS plan, there was no "waiver of premium right" to the insured in the event of total disability, *i.e.,* no right by the insured to continue his or her insurance in effect beyond the payment of the last premium.

[8]The CIGNA policy under the ALLTEL plan defines "Active Service" as follows:

> You will be considered in active service: On any of your Employer's scheduled workdays if you are performing the regular duties of your work on a full-time basis on that day either

2

would be eliminated, and TDS would cease independent operation and be consolidated into one of ALLTEL's many divisions.

In the Fall of 1994, ALLTEL told Mr. Katz that once consolidation was complete, his position would be duplicative and eliminated some time after January 1, 1995. Unfortunately, his misfortune would continue. *On November 3, 1994,* Mr. Katz was hospitalized for a month with severe pneumonia due to the AIDS virus. At that time he elected to participate in TDS' short-term disability program, *effective November 3, 1994,* consisting of a full salary continuation policy, preceded by five days of sick leave, for the next 180 days.

While receiving TDS short-term disability benefits, Mr. Katz applied for TDS long-term disability benefits (funded by the carrier UNUM), *stating in his application that his total disability originated on November 3, 1994.*[9] The UNUM policy has a corresponding 180-day elimination period for total disability,

at your Employer's place of business or some location to which you are required to travel for your Employer's business. On a day which is not one of your Employer's scheduled workdays if you were in Active Service on the preceding scheduled workday.

This Active Service criterion applied both to a TDS employee's effective date of enrollment and initial eligibility, and to any increases in insurance coverage. Eligibility for enrollment with CIGNA under the ALLTEL plan was as follows: "An employee will become eligible and insured in accordance with the terms of the 'Eligibility' and the 'Effective Date' sections of the Certificate."

In addition, the CIGNA policy under the ALLTEL plan stated that:

You will become insured on the date you elect the insurance by signing an approved payroll deduction form, *but no earlier* than the date you become eligible. If you are a Late Entrant, your insurance will not become effective until [CIGNA] agrees in writing to insure you. *If you are not in Active Service on the Date you would otherwise become insured, you will become insured on the date you return to Active Service.*

(Emphasis added.)

[9]The UNUM policy defines disability as follows:

"Disability" and "disabled" mean that because of injury or sickness:

1) The insured cannot perform each of the material duties of his regular occupation; and

2) After benefits have been paid for twenty-four months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fit by training, education, or experience.

3

therefore long-term disability benefits would begin May 13, 1995.[10]  Also at this time, Mr. Katz applied for Social Security disability benefits, indicating on his application that *the onset of his total disability was November 3, 1994.*

Although self-avowed to be disabled, from his hospital bed, on December 2, 1994, Mr. Katz undertook to enroll in the ALLTEL plan, including its $620,000 CIGNA life insurance component,[11] by completing and signing the ALLTEL-generated enrollment card.  From January 1, 1995, through May 13, 1995, ALLTEL deducted from each of Mr. Katz' short-term disability paychecks the employee-paid portion of the life insurance premiums due for $620,000 in coverage under the ALLTEL plan.[12]

Toward the end of 1994, however, Mr. Katz began negotiations with an ALLTEL representative regarding a severance package.[13]  By May 1995, an agreement was finally reached.  ALLTEL paid Mr. Katz $262,500, in return for his general release, setting forth the terms of a final settlement of his claims arising out of his TDS employment contracts.[14]  Upon his death, August 9, 1995, CIGNA paid $418,000, plus accrued interest, in life insurance benefits to his beneficiary, Mrs. Katz.

---

[10]The two policies dovetail in that if Mr. Katz had undertaken to work during the short-term disability elimination period, his long-term disability benefits could not have started for another 180 days.

[11]Under the TDS plan, Mr. Katz was, or had been, entitled to receive $418,000 in life insurance benefits pursuant to the terms of the Mass Mutual policy.

[12]The higher premiums were apparently deducted in anticipation of Mr. Katz' return to work.  After Mrs. Katz filed suit, ALLTEL attempted to reimburse her for this minimal amount, representing the difference in coverage.  She declined to accept the reimbursement.

[13]During the severance negotiations, on February 3, 1995, Mr. Katz sent ALLTEL a letter to confirm continuance of $620,000 in life insurance benefits during his period of disability.  By letter dated April 7, 1995, ALLTEL responded by confirming coverage;  no amount of coverage was mentioned.

[14]In consideration for the $262,500 severance benefit payout, the general release provided that Mr. Katz "irrevocably and unconditionally releases, acquits, and forever, discharges ALLTEL from any and all charges, complaints, claims, liabilities, obligations, promises or any other cause of action of any nature whatsoever, known or unknown."  It provided that it was binding upon and inures to the benefit of "Katz, his heirs, representatives, executors, and successors and assigns, and shall inure to the benefit of ALLTEL."  Mr. Katz signed the release and returned it to ALLTEL.  Mr. Katz made handwritten, initialed changes providing, in essence, that he would continue to have ALLTEL group life insurance benefits after severance.  ALLTEL did not respond to the penciled-in changes.

4

## II. PROCEDURAL BACKGROUND

Mrs. Katz filed suit against ALLTEL and CIGNA for ERISA (Count I) and equitable relief (Counts II through IV). Specifically, in Count II, Mrs. Katz asked for restitution and other equitable relief for ALLTEL's alleged breach of fiduciary duties under § 1132(a)(3). In Count III she asserted that ALLTEL and CIGNA should be equitably estopped from denying her entire claim for benefits, a difference of $202,000 in monetary damages. In Count IV she asserted that the actions of ALLTEL and CIGNA constituted waiver and sought damages of $202,000. *See also* note 1 *supra.*

By separate order dated December 17, 1997, the district court first dismissed the three equitable counts. *See Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).[15] The district court order left Mrs. Katz free, however, to pursue her claim under Count I for § 1132(a)(1)(B) benefits. It also specifically authorized the assertion of equitable estoppel principles as a theory for recovery within the section (a)(1)(B) context. *Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1285-86 (11th Cir.), *cert. denied,* 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990).

Mrs. Katz proceeded with her § 1132(a)(1)(B) claim under Count I. Eight months later, in August of 1998, in an unreported decision and second order, the district court again ruled against her and granted ALLTEL and CIGNA's motions for summary judgment.[16] This appeal follows.

## III. STANDARD OF REVIEW ON APPEAL

We review a grant of summary judgment *de novo,* applying the same standard as the district court. *Korman v. HBC Florida, Inc.,* 182 F.3d 1291, 1293 (11th Cir.1999) (citation omitted). "Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to

---

[15]It concluded that: (1) Mrs. Katz had an adequate remedy in the form of a right to bring a claim for benefits under § 1132(a)(1)(B); and (2) the relief sought to redress the fiduciary breach claim of § 1132(a)(3) was "not substantively different" from the benefits sought under the § 1132(a)(1)(B) claim. *Katz v. ALLTEL Corp., et al.,* 985 F.Supp. 1157, 1161 (N.D.Ga.1997).

[16]The district court found the "active service" requirement of the ALLTEL plan was unambiguous; that Mr. Katz, despite his timely enrollment in the ALLTEL plan, was not in active service on January 1, 1995; and, in fact, that Mr. Katz was never a participant in the ALLTEL plan at all.

judgment as a matter of law." *Id.* (quoting *Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1369 (11th Cir.1998)). "When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Id.*

IV. DISCUSSION

A.     *The December 16, 1997 Order*

The district court dismissed Counts II through IV of Mrs. Katz' complaint without examining the merits of her equitable claims. *See also* Part II *supra.* Under its interpretation of *Varity,* it concluded that an ERISA plaintiff with an adequate remedy under § 1132(a)(1)(B), cannot alternatively plead and proceed under § 1132(a)(3). *See Varity,* 116 S.Ct. at 1078-79. Therefore Mrs. Katz was limited to her section (a)(1) claim. The district court based its holding upon two reasons: (1) that Congress had provided adequate relief for Mrs. Katz' alleged injury elsewhere; and (2) that section (a)(3) was merely meant to be a "catchall" provision, providing relief only for injuries not otherwise adequately provided for by ERISA.[17] *Katz,* 985 F.Supp. at 1161. This circuit has interpreted *Varity* similarly. *See Blue Cross & Blue Shield of Alabama v. Sanders,* 138 F.3d 1347, 1352-53 n. 4 (11th Cir.1998) (where a panel of this circuit allowed an insurance company to assert an equitable claim under § 1132(a)(3) only because the insurer had no other available remedy under § 1132(a)(1)).

At the time the December 17, 1997, order was entered, Mrs. Katz had an adequate remedy under § 1132(a)(1)(B), a position which she was strenuously asserting in Count I of her complaint. As it later turned

_____

[17]The Supreme Court, in *Varity,* stated:

> The statute authorizes "appropriate" equitable relief. We should expect that courts, in fashioning "appropriate" equitable relief, will keep in mind the "special nature and purpose of employee benefit plans," and will respect the "policy choices reflected in the inclusion of certain remedies and the exclusion of others(4)27" Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."

116 S.Ct. at 1079 (citation omitted).

6

out, we know that she did not prevail on the merits of that claim. However, the availability of an adequate remedy under the law for *Varity* purposes, does not mean, nor does it guarantee, an adjudication in one's favor. Therefore, under a *de novo* review, we conclude that the grant of summary judgment by the district court in the first order was correct and is to be affirmed.

**B.**    *The August 26, 1998 Order*

**1.**    *Section 1132(a)(1)(B) Benefits*

Mrs. Katz' remaining claim against ALLTEL and CIGNA was made pursuant to § 1132(a)(1)(B). This section provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due under the terms of the plan, to enforce rights under the terms of the plan or to clarify rights to future benefits under the terms of the plan ...." § 1132(a)(1)(B). She challenged the decision by ALLTEL, as administrator of the ALLTEL plan, to deny her claim for $620,000, and instead, pay her $418,000 in life insurance benefits.[18]

The CIGNA policy under the ALLTEL plan would become effective January 1, 1995, for all former TDS employees in "active service" on that date. *See* note 8 *supra*. The district court concluded that the construction of the CIGNA contract, including the determination and resolution of ambiguities regarding its "active service" requirement, was a question of law. *See Claussen v. Aetna Cas. & Sur. Co.,* 888 F.2d 747, 749 (11th Cir.1989). It held that the active service requirement was unambiguous and a condition precedent to an employee's eligibility for benefits.[19] Under our *de novo* review, we agree. *See Gridley v. Cleveland*

---

[18]As the district court properly pointed out, Supreme Court and Eleventh Circuit precedents have developed a judicial standard of review for decisions made by a plan administrator. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989) (denial of benefits under section (a)(1)(B) reviewed under a *de novo* standard unless plan administrator has discretionary authority); *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1449-50 (11th Cir.1997)(heightened arbitrary and capricious standard where there is a conflict of interest and plan administrator pays benefits out of its own assets). Mrs. Katz contends that either standard should apply to this case.

[19]Under the CIGNA policy, an employee was defined as "a full-time employee of the employer. The term [employee] does not include employees who work part-time or temporary, or who normally work less than twenty hours a week for the employer." Under the Effective Date provision, "if you are not in active service on the date you would otherwise become insured, you will become insured on the date you return to active

*Pneumatic Co.,* 924 F.2d 1310 (3d Cir.1991). Mrs. Katz' mere statement to the effect that the policy language was ambiguous, without explanation, argument or case law, is meritless.

We now turn to the question as to whether Mr. Katz was ever in active service with ALLTEL at any time after January 1, 1995, the date the ALLTEL plan and its CIGNA life insurance component became effective. It is undisputed that, by November of 1994, Mr. Katz was very ill. He was in the terminal stage of his AIDS suffering, having endured numerous years of medical care and countless hospitalizations. From his hospital bed, he elected to receive short-term disability benefits, to become effective November 3, 1994. Mr. Katz then applied for long-term disability benefits to begin May 13, 1995, *i.e.,* 180 days after the onset of his total disability date, November 3, 1994. He also applied for Social Security disability benefits indicating a disability date of November 3, 1994.

We have reviewed the record in this case extensively. The evidence is undisputed. Mr. Katz never returned to work after November 3, 1994, and was not in active service on January 1, 1995, the date the ALLTEL plan and its CIGNA life insurance component became effective.[20]

2.      *Equitable Estoppel within the Section 1132(a)(1)(B) Context*

In its earlier order, the district court stated that "[w]hile [Mrs. Katz] may not assert equitable estoppel as a separate claim, this does not prohibit her from asserting principles of equitable estoppel as a theory for recovery of benefits in Count I." *Kane,* 893 F.2d at 1285-86. Mrs. Katz complied. She thereafter vigorously

---

service."

[20]As we know, upon Mr. Katz' death on August 9, 1995, CIGNA paid $418,000, plus accrued interest, in life insurance benefits to his beneficiary, Mrs. Katz. This is the amount of life insurance benefits *that would have been due under the old TDS plan and the old Mass Mutual policy on or before December 31, 1994. See* note 7 *supra* (discussing the lack of a waiver of premium provision under the Mass Mutual policy for disabled employees such as Mr. Katz). As the CIGNA policy states, "if you are not in active service on the date you would otherwise become insured [January 1, 1995], you *will become insured on the date you return to active service.*" (Emphasis added.). As we know, Mr. Katz never returned to active service. It would appear that CIGNA could have denied coverage entirely and paid Mrs. Katz nothing. ALLTEL and CIGNA, however, make no claim for that result. At oral argument, counsel for CIGNA stated that under these circumstances it elected to see that an employee in Mr. Katz' situation did not lose, by the acquisition, what he was entitled to before the acquisition. We salute CIGNA's decision.

argued that ALLTEL, as plan administrator, was estopped to assert the "active service" and "effective date" provisions because of the assurances Mr. Katz received from ALLTEL and CIGNA during his disability that he, as Senior Vice President, would receive $620,000 in life insurance benefits under the CIGNA policy.[21]

In its second order, the district court examined the merits of Mrs. Katz' equitable argument under ERISA. Upon review of the CIGNA policy, the district court had previously concluded that its "active service" provision was an unambiguous provision. *See* Part IV.B.1. *supra.* Mrs. Katz could, therefore, not rely on any alleged oral modifications under the principle of equitable estoppel. *Kane,* 893 F.2d at 1285-86. Any alleged representations that Mr. Katz was insured under the policy amounted to an impermissible extension of coverage to an employee not in active service. *Id.* at 1285 n. 3.

We agree. This circuit has created a very narrow common law doctrine under ERISA for equitable estoppel. *Glass v. United of Omaha Life Ins. Co.,* 33 F.3d 1341, 1347 (11th Cir.1994), citing *Kane,* 893 F.2d at 1285-86. It is only available when (1) the provisions of the plan at issue are ambiguous, and (2) representations are made which constitute an oral interpretation of the ambiguity. *Id.* As the "active service" provision of the CIGNA plan was unambiguous, equitable estoppel is unavailable to Mrs. Katz as to her claim for ERISA benefits under Count I. *Id.* The August 26, 1998, order of the district court is correct and affirmed.

## V. CONCLUSION

Based upon the foregoing, the district court orders granting summary judgment for ALLTEL and CIGNA are AFFIRMED.

---

[21]The six assurances alleged by Mrs. Katz are: (1) that ALLTEL told Mr. Katz in advance that he would be eligible under the CIGNA policy for $620,000 in coverage; (2) that he applied, and ALLTEL accepted his application, for $620,000 in coverage under the ALLTEL plan and CIGNA policy; (3) that Mr. Katz paid, and CIGNA accepted, insurance premiums in the amount called for by CIGNA's policy for $620,000 worth of coverage, from January 1 through early May 1995; (4) that neither ALLTEL nor CIGNA ever suggested any additional requirements for eligibility nor expressed any doubt about the existence or amount of Mr. Katz' coverage, until Mrs. Katz submitted her claim for death benefits; (5) that on January 20, 1995, ALLTEL sent Mr. Katz an unsolicited written notification (for income tax purposes) of life insurance coverage in the amount of $620,000; and (6) that in severance negotiations and exchange of letters, it was Mr. Katz' understanding that he had $620,000 in life insurance under the CIGNA policy. *See also* note 12 *supra.*